The next case is number 2007-1197, Energizer Holdings and the Aberretti Battery Company against the International Trade Commission. Mr. Littner. Good morning, Your Honors. If it pleases the Court, this appeal is about, admittedly, the logical claim construction that is entirely inconsistent with the specification in the loan, the preferred embodiment of the invention. The Commission and the interveners justify this illogical claim construction by blaming the previous panel, two of which are present here today, and hiding behind an incorrect interpretation of the mandate rules. So let me ask you if I could. I guess it was in Phillips, our latest en banc claim construction effort, we quoted an opinion of Judge Ritz saying that the specification is important inasmuch as the words of the claims must be based on the specification, correct? I agree totally with that. Okay. Now, what, assume for the moment that you were one of skill in the art, okay? Yes. And you were presented only with the specification of the 709 patent. And you were told, all right, would you please draft for me a claim that claims the invention that is disclosed in the 709 patent? What would you claim? Well, I don't think it's any secret I would claim zinc. You'd claim a text, right? Absolutely not. I would not claim a text because that would be a disservice to the client. The law specifically would permit me to claim the article into which the test which I've invented goes to make it. It's novel. The article is novel. There had never before been an alkaline battery produced that had zero mercury. There is no reference out there. That is the keynote to novelty in that claim is the zero mercury recitation. But I'm looking at the description of the invention. It says the electrochemical cells of this invention are substantially free of mercury. And the specification seems to speak to a kind of a test cell. No. It doesn't? The specification speaks to the cell of this invention. And if I can just go there very quickly. The specification of the 709 patent makes clear from the outset that the problem the inventor was seeking to solve was zinc corrosion. And where did that problem manifest itself? In the cell that was in the store. In the cell that was placed in the flashlight. The flashlight is turned on. Put on the shelf. After it's turned off, the cell would expand absent the mercury, ruin the flashlight, ruin the battery, or ruin the camera, ruin whatever appliance it happened to be in. Now that's the problem he set about to solve. And he solved it by determining that it was the zinc that was causing the problem and how do I to classify zincs according to their propensity to expand. And he developed a class of what he called low-expansion zincs. Now mind you, I agree it took a test to determine which were low-expansion zincs and which were not low-expansion zincs. But when he sat around to claim it, as I hope I would have had the foresight to do myself, he claimed it in the article which was going to be on the market, i.e. the battery. That is the electrochemical cell. It has, if you'll note in the claim, that electrochemical cell has a cathode, an anode, and the electrolyte as the major components. Now the test cell has no cathode. No cathode whatever. But that's right. Now that's the thing. It seems to me, and maybe if I'm wrong it wouldn't be the first time, but I'm looking at the specification. It seems to claim some kind of a test cell. The specification as opposed to the claim? The specification, yeah I'm sorry. The specification seems to be discussing some kind of a test cell. Well it discusses a test cell and it also discusses a battery wherein the results obtained from that test cell have been utilized to select components that will not gas after the battery has been partially discharged despite the absence of mercury. That's what this is all about. But is the focus of the discussion in the specification on a commercial battery cell? I believe it is. But to get there, again I say to get there, you have to use the test cell to determine which zincs are suitable for use in that commercial cell. And then we turn around and we claim the commercial cell itself and we do so by describing the zinc by the characteristics, the physical characteristics that render it a quote low-expansion zinc as the inventor used that term. Now when these claims started out in the patent office, that's exactly how it was claimed. It was claimed a cathode, an anode, the electrolyte, etc. wherein the zinc was low-expansion zinc. And the examiners said, no, no, no, you can't do that. That's vague and indefinite. You can't use low-expansion zinc. And so... Well, Mr. Litton, let me interrupt you there because this patent, the 709 patent, is one of a series of continuation, continuation in part applications. And there was an earlier application that matured to the 715 patent. And if I'm not mistaken, there was a terminal disclaimer filed because of the overlap between the 715 and the 709 patent. But looking at the 715 patent for a minute, and this is in the appendix at page 2244, claim one of the 715 patent is, I think, the claim you intended to put in the 709 patent, but you didn't because that patent talks about a cell. It's the exact same cell that's in claim one of the 709 patent. And if you'd like, I'll just wait a second so you can get a copy before you. 2244. It's in volume four. Do you see that? And claim one. And if you compare that claim with claim one of the 709 patent, aside from the fact that the 715 patent also claims a burnished brass anode current collector, other than that, the claim is exactly the same as you would like us to read claim one in the 709 patent. And you'll notice that the phrase at the end, which is in dispute here, calls for said zinc having a gel expansion of less than 25%, et cetera, whereas the claim in question calls for said zinc anode having a gel expansion. The zinc is in the gel. The anode's the gel. Is that right? The anode is the gel. So in the 709 patent, you claim, you may not have intended to claim it, but you've claimed the anode, which we have already determined refers back to the anode gel, whereas in the 715 patent, you claimed the zinc, which is, I think, what you probably intended to do in 709, but you didn't. So we are left with the claim that you have and not the claim you wish you have. Well, I understand that perfectly, Your Honor, but if you look at the specification of the 709 patent, and you look specifically in columns four and five, you will see that at line 38 of column four, the specification states, for the cells of this invention, those are the ones that are claimed, that's the one that includes the cathode, so they're the cells of this invention, the expansion rate of the anode gel, now note that term, the expansion rate of the anode gel, not zinc anode, the expansion rate of the anode gel is measured according to the following procedure, and then it goes through almost two columns of how you take the zinc that is going to become or has already become a constituent of that anode gel, run it through the test cell, and determine whether or not it is quote, low-expansion zinc, in other words, whether or not it has an expansion rate of less than 25% after being discharged according to the parameters there set forth. If it is, that tells you, you can use it in a zero-mercury battery, and therefore, the anode gel, the problem is that you haven't claimed a battery which uses zinc as measured or determined by a test, you've claimed a battery with a zinc anode gel, which in order to meet the characteristics set forth in this claim, has to have at least 63 grams of zinc, and that is the structure. Well, I simply don't agree with that. I submit that what we've claimed is a battery that has a zinc which possesses the characteristics, that when... Well, will you agree with me that if this claim, this last phrase in claim one is talking about the anode gel having a gel expansion of less than 25% after being discharged for 161 minutes to 15% depth of discharge at 2.88 amps, if that claim describes that gel, that that gel has to have 63 grams of zinc? No, I would not, because the claim has to be interpreted to see what is to be tested to determine whether or not the anode gel possesses that characteristic, which is there described, and when you go to the specification... But the claim doesn't say whether it has zinc that possesses a characteristic, it claims a gel. It claims a gel. I mean, trust me, I've tried to read it your way many, many times, and I'm trying to see my way through this as best I can, and I just can't read it any other way, particularly in light of the ruling that was made in our last decision, which I think is binding. Again, I do not think the last decision, let me, not again, but for the first time, I do not think the last decision went into the claim interpretation that we're talking about here today. In order to decide the issue here today, you have to interpret the claim to see what is to be discharged, what has to have the properties set forth in the last phrase of that claim, and if you go to the specification to investigate that, you find the specification tells you it is a zinc constituent. I believe... Mr. Lind, didn't we construe the claim, though, because we say at the end of the opinion in the previous case, we said, it is apparent that the claim can be construed, and then the opinion concludes in that regard, namely in the regard of claim construction, we conclude that anode gel is by implication the antecedent basis for said zinc anode. Yes, you said that. My contention here today is that if the anode gel, if that anode gel is made of using zinc that has the resided gel expansion characteristics, the anode gel has that characteristic, and I submit to this court it makes no difference whether the antecedent basis is anode gel or whether it's zinc, because the specification teaches in either case, focus is on the zinc constituent to determine whether or not the battery falls within the scope of the claim. You know, it's inappropriate, of course, to interpret a prior ruling. It stands on what it says, but the issue before was a highly hyper-technical question of how you draft claims with antecedent basis. That is correct. And my recollection is that that's what the panel was resolving and telling the commission that however you're looking at this claim, these words do have an antecedent basis, and this is it. The anode gel, which it's not an anode, of course, unless it contains zinc. So that was not an issue, as I recall in the case before. But we take our decisions as they appear. Let's hear from the other side, and we'll save you rebuttal time. Thank you. Mr. Harrington? Good morning, Your Honor. May it please the Court? This appeal turns on this Court's decision in the earlier appeal and the application of the mandate. In this decision in the earlier appeal, this Court said that sedznik anode refers to the term anode gel, which appears earlier in the claim. That anode gel is the anode of the claim electrochemical cell. Is the commission held? But it's an anode. It can't be an anode unless there's metal in it. Can it be? It's an anode. Yes. Right? It's an anode. The anode gel of the claim is the anode of the claim electrochemical cell. Yes. The thing that I thought was interesting about the commission's conclusion was that they treat it as if it's entirely the gel component, whatever it is, without that which and an anode of zinc. They're both gelled. Of course, that's how cells are made, as I understand it. Your Honor, we treated the term anode gel as the anode of the claim electrochemical cell. It's the anode, of course, and it contains whatever is in the anode. Yes, and that includes the active anode component, along with some other materials as well, binder, gelling agents, additives. That's what confused me. How could the commission construe anode to eliminate the metal which gives it its electrochemical properties? Oh, we did not. There is nothing in our opinion that suggests that. What we said in our opinion is that the anode gel is made up of – it includes the active anode component. It includes additives such as the indium compound. It could include things like the polyethylene oxide, the binding agent. It could include many things. The point was that the anode gel of the claim is a multi-component item, which includes, as the claim itself specifies, the claim itself says the anode gel includes zinc as the active anode component. So the zinc is a component of the anode gel, and the anode gel is the anode of the claimed electrochemical cell. And you can see this just from reading the claim itself. The claim itself purports to recite an electrochemical cell. It recites an electrolyte, it recites a cathode, and then it says anode gel. Well, of course, to have an electrochemical cell, you've got to have three things. You've got to have the electrolyte, you've got to have the cathode, and you've got to have an anode. Well, in this particular case, the anode gel is that anode. And that's how it's treated in the specification as well, Your Honor. There are a number of cases in the specification which make it quite clear that the anode gel is the anode. I can refer you to example one, for example, where it refers to anode formulation. And there are other portions of the specification. No, that's what it looks like to me as well. It seems to me that the problem, and I'm trying to somehow harmonize it with the commission's decision, is, in fact, whether any person of ordinary skill in this field reading claim one would think that every single cell has to contain, is it, how many, how many grams, how many parts per million of... 63. Okay. 63 grams of zinc. That every single energizer cell that's sold has first been discharged for 161 minutes to a 15% depth in order for it to be within the protection of the patent. And that's what the commission held, didn't they? They're really criticizing the way the claim was written. Obviously because, as we've observed, the companion patent is written in a slightly different manner. The commission held two things. One with regard to the written prescription requirement, and the other with regard to infringement. The way the claim is drafted, the anode gel, which is the anode of the claimed electrochemical cell, must, is required to be discharged according to certain discharge parameters. There is no dispute that in order to satisfy those discharge parameters, the anode or anode gel of the claimed electrochemical cell would have to have 63 grams of zinc. Well, of course, there's nothing like that. Well, it's clear from the specification that this is the test for the purity of the zinc. It seems to me the question is, when it's, when you have a potential disharmony between what's clear from the specification, what's the only reasonable reading of this test, whether in fact to read the claim as referring to the test, rather than as a requirement that every energizer battery must be discharged for 161 minutes before it's sold. Well, that... And every accused battery as well. The requirement of the claim is clear. I think what the appellants would like to do is to ignore the claim language and have the claim rewritten. I'd say the claim is unclear because it's impossible. No one's ever said otherwise. It's impossible that these parameters can be met. Anybody would notice that. Oh, I would... Right? You'd have an enormous battery, and you'd have to discharge it before you could charge it with infringement. Well, there is no dispute about the discharge language calls for 62 grams of zinc in the anode, but it's physically possible. It just isn't described in the specification. And on the other side, leaving aside the description requirement issue, of course it's conceded that none of the accused cells, accused batteries, have 63 grams of zinc. And none of the patented ones either. I'm sorry? And also none of the patented cells. I think that's an interesting question. When it's so clear what was intended to be covered by the claim, what, in fact, is the correct way to read that claim? If the claim language is clear, and it is clear in this case, it has already been construed by this court. If it's clear... When did we construe the claim language? In the earlier opinion. We construed antecedent basis in the claim only. That was the issue. I would submit, Your Honor, that in the previous case, you had to construe the claim. And the reason for that is... The commission didn't construe the claim. The commission said, this term has no antecedent basis. Too bad. You should have done better. We found the claim indefinite because... Well, it was undisputed, Your Honor, that there was no express antecedent basis for the term sed zingano. The parties in the case argued to us, well, yes, there really is, because on the appellant side, they said, sed zingano, it's sed zing. Now, the intervener said, no, it's sed zingano refers to anogel. We rejected the appellant's argument in our earlier decision because to have accepted it would have meant we would have had to rewrite the claims, and we're not committed to do that. We did think that there was something to the intervener's argument, that there was some support and specification for that. But for us to have accepted that would have required, in our view, accepting an internal inconsistency in the claim, so we couldn't accept that either. So because the two competing claim constructions were unacceptable at that time, we found the claim to be indefinite. Now, this court said, no, we can construe the claim, and that what this means, what sed zingano means, is anogel. The court said that there is a reasonable antecedent basis. That was the issue. Well, I would say, Your Honor, in order to have come to that conclusion, you would have had to have construed the claim. Let me just mention a few things that were in the energizer's opinion. Let me ask you a divergent question. If the commission doesn't follow the policy, as soon as the commission finds an area on which they think the issue, the case, could be disposed of, even if the ALJ has decided 10 other issues, the commission resolves just one. Is that right? We are permitted to do that under this court's decision in Boyd against Othelme Boyd. In fact, the appellant cited that case in their brief. In this case, there are two dispositive issues, and we addressed both of them. Very hard to stay within the statutory requirement of rapid resolution. Here we're back on another narrow issue. If it should, I don't know how it will come out. But if, perchance, the commission is reversed, then there are all the other areas that were decided by the ALJ. Are we to assume that the commission has accepted everything else the ALJ decided? I know, Your Honor. I don't think I can say that. Then the statutory purpose, one of them, of ITC proceedings with all of the tight time restraints that the statute places on the commission, really are subverted, I guess is the word, by such proceedings. Not really, Your Honor, because the statute says we conclude the investigation as early as practical. Now, in this particular case, we had a situation where the first time around, we found the claim to be indefinite. Once we find a claim to be indefinite under the Honeywell case, we're not really permitted to go any further. But the ALJ has, meanwhile, done a complete trial. I think that the ALJ's decision was, I don't know, 100 or more pages long. Yes, it was. So all those issues remain unreviewed, in your view? At the present time, Your Honor, those issues would be open issues if the case was sent back to us. May I mention one thing? I just wanted to point out one thing in the Energizer opinion. And that was the statement that an analysis of claim indefiniteness is inextricably intertwined with claim construction. And of course, you could see that in the earlier appeal, because in order for one of the parties to prevail, or rather the appellant who was taking the appeal to prevail, they would have to show that the claim can be construed. And the way they attempted to do that. No, it doesn't. What you've quoted means it's fairly treatable as a question of law. It doesn't mean that when we decide indefiniteness, we're also deciding 20 other issues. Sub silentio. I would not argue that any issue other than indefiniteness was involved. What I'm saying is that when you decide indefiniteness, the argument to you is that the claim can be construed. And that was their argument. They argued that citizens can't admit sentencing. That's how they argued that appeal. But this court disagreed with that. And now we have the decision of the earlier court, of the earlier decision of this court, and under the mandate rule, I think that disposes of the case. They don't actually argue that the consequences of following this court's decision under the mandate rule don't result in a failure to meet the written description requirement or show a failure to demonstrate infringement. Mr. Harrington, forgive me for interrupting, but as I read our opinion when the case was here last, it was my understanding that the commission argued that the claim was indefinite not only because it lacked an antecedent basis, but also because even if the antecedent basis were found to be the anode gel, that the claim is still indefinite because it would require an anode that has 63 grams of zinc. Yes. The commission argued both of those points last time. Am I reading this correctly? We, in our opinion, that was on appeal, we explained why said zinc anode could not be said zinc because it involved rewriting the claim. And we also indicated that we couldn't accept said zinc anode equals anode gel either on appeal. That's the same argument that's being argued here. That's correct. That's correct. So both of those issues were presented last time? Well, the appellants, of course, wanted to argue and did argue that said zinc anode means said zinc. That was their argument. This court didn't accept that argument. We argued to this court that to accept that argument would mean that we'd have to rewrite the claim and we're not permitted to do that. We would have to write said zinc anode as said zinc, eliminating anode as the noun and substituting zinc. I understand that, but did you also argue the point that we're arguing here with respect to indefiniteness because the claim, if it's read to read said anode gel, that that would require a battery of 63 grams of zinc? We certainly explained that. Explained or argued or presented? I'm trying to get at what issues were before the court to decide what issues were resolved. And I'm trying to remember. I know that said zinc anode equals said zinc was before the court because that was the substance of the appellant's appeal. Yeah, that's clear. There's no dispute about that. I'm trying to remember. I'm standing here. I cannot remember whether we had a separate argument. I know it was discussed in the brief. I just cannot recall whether it was discussed in the argument section of the brief. Fair enough. James, one question I have. What do you understand the written description of the patent to be describing? The specification? Specification, yes. Well, I understand the specification to be describing a screening test for zincs, which if they pass this test, will eventually be used or could be used to make an electrochemical cell. And the screening test involves the so-called test cell, which is referred to in great detail in the specification. And it really has to because the specification indicates that whatever del expansion is, it is highly dependent upon the shape and the size of the test cell. So what the specification describes is a test for screening zincs for use in electrochemical cells. And the examples set out two electrochemical cells, which have been made using zinc, which was screened for utility using the screening test. OK, we've exhausted your time. We've exhausted your colleagues' time. We can give you one or two minutes if there's something that you must tell us that we haven't yet heard. Yes, say two minutes. But don't repeat what we've already heard, if you can avoid it. Judge Schall puts his finger on exactly the correct inquiry. What is the invention? What imparts novelty here? It's not low-expansion zinc. The examiner correctly rejected a claim constructed around low-expansion zinc as being indefinite and also as being obvious, because it was in the prior art, a point that Everetti conceded in connection both with its prosecution of the parallel European application, where it said, it is known from the prior art that low-expansion zinc removes the need for added mercury, and also in its brief, where it says a given lot of zinc powder from a given manufacturer could sometimes be used to manufacture zero-mercury alkaline batteries without experiencing unacceptable post-discharge gasoline-resulting leakage, but not always. If it passes the test, right? They're saying it may pass this test of 90 days and 45 degrees. Right, it may pass, but not always. And basically, the record showed is that everyone was doing the same thing. Everyone was taking existing supplies of zinc, some good zinc, some not-good zinc, and putting it into batteries without mercury to see if it worked. So those batteries existed in the prior art. Some of those batteries had good zinc, what they call low-expansion zinc, that if you had tested it, would have come up with this low-expansion zinc. Is that in the record? I don't recall those purified zinc. Yes, the record shows that SIPL and other battery manufacturers were constructing zero-mercury added alkaline batteries using existing supplies of zinc. The problem that Everetti was having is that you couldn't consistently, reliably tell that if you put supposed good zinc in a battery, it would or would not expand in a way that was not acceptable to consumers. So Everetti needed a test to make the zinc reliable before it put zinc from the same lot into a battery. The invention here... But that doesn't mean that every single battery has to individually go through the test, does it? Which is what the commission said. It shouldn't mean that, but like the patentee in the Chef America case, the patentee here provided for that in the claim language, and it is not for the court or the commission to redraft the patent for the patentee, even if the claim language deliberately selected by the patentee produces an illogical result. Thank you, Mr. Holman. Thank you for the additional time, Your Honor. Do we have two more minutes, Your Honor? Yes, would you enlarge Mr. Litton's time by the amount we've run over? Thank you. I just have two or three points I'd like to make. The first one is, sitting here, it seems to me that we're talking about this claim as though it were a process claim, or a product-by-process claim. It's not. It's a product claim. Wherein the product, the constituents of the product, are defined by their physical characteristics precisely as this court sanctioned in the Union Carbide case. Secondly, in response to your earlier question, Judge Lynn, my colleagues alert me to the fact I should have said, I claim the batteries, which are the subject of Examples 1 and 2 of the specification. Now those batteries are zero-mercury batteries, and they're each made with zinc, which has been adjudged to have a 6.2% rate of gel expansion. And the way... If you had claimed it that way, I don't think we'd be here. The problem is you didn't. Well, I'm arguing that we did, because the specification says that you determine the gel expansion of the anode gel by testing the zinc. That's exactly what it says. The file history says... Where does it say that? It said that in... Form 4... In the claim. Form 4, line 38. It says, and I quote... For the cells of this invention, the expansion rate of the anode gel is measured according to the following procedure. And then it goes through how you take the zinc, put it in the test cell, compound it in a very special mixture, and discharge it according to the... To determine whether it has the characteristics set forth in the claim. And then, on the next page, it says... You know, you make an equation. You determine this percentage. And on the next page, it states... The low-expansion zinc useful in the cells of this invention typically exhibits SRVER, but if you look up just above there, it says the relative volume expansion rate, SRVER. So may I read that? The low-expansion zinc useful in the cells of this invention typically exhibits a gel... A volume expansion rate or gel expansion rate of less than 25%, exactly as it says in the claim. So, that's the first thing. Now, I need to reply... But let me go to the file history. In the file history, the claim is amended to take the word gel out. And the statement is made... We're doing this to make it clear that it's the zinc that's to be tested. Now... You know, that measures up, at least I believe, to Applicant being his own lexicographer in the file history. He came as... He defined zinc. He defined zinc anode in that amendment. So, what expands? The anode expands, is that right? When you say the low-expansion rate of preferably less than 25%, it's the anode which is expanding. Is that correct? Right. The gel has to be there to trap the gas. And that's where the expansion occurs. But the gas emanates from the zinc. It's the corrosive effect of the zinc that causes the gas to generate in the first place. The zinc in the anode. Absolutely. Which is the gel. And the other thing we're missing here is... You know, it is true you said that the antecedent basis is anode gel, but take a look at that entire phrase. It says, an anode gel consisting of zinc as the active anode component. I think that's also part of the antecedent basis. Certainly so. I mean, that was not really an issue in the previous appeal, as I recall. That's correct. You decided, as rightfully you should have, that the claim was not vague and indefinite for lack of an antecedent basis. That, as you described, I think, was a fairly hyper-technical inquiry, okay? But, you know, that's a long way from saying in order to determine whether or not a battery out there in the market possesses the characteristics recited in this claim, what do we have to test? That's where this claim needs interpreted in this proceeding, and I suggest to you the answer to that question is that it is the zinc which was utilized to compound the anode gel that has to be tested, and I suggest that that is pointed out specifically in the specification. It's pointed out in the file history. You have three expert witnesses who testified it was the zinc that has to be tested. You know, now suddenly we have, begging your pardon, we have lawyers trumping the testimony of those skilled in the art by saying it's not that. It's the anode gel that has to be discharged, and it makes no sense in the context of the patent, and it really makes no sense even with the language, with all deference. And the other thing, finally... Mr. Litton, just one quick question. Go ahead. I noticed in the 709 patent that the abstract has the same language, but in the abstract it talks about the gel, not the zinc. It says alkaline cells are substantially free of mercury and employ a zinc anode gel, which gel has an expansion of less than 25%, etc., etc. That's not the zinc, it's the gel, again. And that was not amended to delete the word gel. I understand it wasn't, but... It's the way it works. It's the zinc that corrodes and releases the gas which swells the gel, which leaks from the battery. Is that an oversimplification? Well, it is, only to the extent that the gel may expand enough in and of itself to rupture the battery. Well, instead of to leak. At that point, it's not an oversimplification. Not at all. Finally, I just want to say a word about a couple of things. This European prosecution thing, what counsel referred to was retracted in the subsequent amendment. There was never an admission that was permitted to stay on the record that batteries containing zero mercury and low expansions, they were old. There was never an admission like that permitted to stay on the record. Also, again, I appreciate your concern with the timing of this thing. We're starting to feel a little bit like a basketball here before the ITC getting bounced around. Have the patents expired? Let's see. 19... No, not quite. Okay. Oh, okay. Thank you. All right. Thank you all. The case is taken under submission.